# WINDOW ROCK DISTRICT COURT

## October 11, 1983

## No. WR-CV-197-82

IN THE MATTER OF THE ESTATE OF:

BOYD APACHEE, Deceased.

Honorable Tom Tso, Judge presiding.

THE CASE BEFORE THE COURT

This case involves a dispute over the distribution of the property of Boyd Apachee, who was killed in an automobile accident between Window Rock and Ganado on November 7, 1981. He was 27 years of age at the time of his death.

On October 2, 1981, 36 days before his death, a default decree of divorce was entered aganst Mr. Apachee. Custody of the decendent's minor child Lloyd Apachee, (who is now five years of age), was given to the child's mother, Rebecca Jane Apachee (who appears in this probate as Rebecca Jim, the guardian ad litem for the child). The Crownpoint District Court's decree required the decendent to pay $200.00 per month to Mrs. Jim for the support of Lloyd. The first monthly payment was to commence in November, of 1981.

At the time of the decendent's death he was living at the camp of his mother, Faye Apachee. The other individuals living at the same camp, which is at Wide Ruins, were the decendent's father, Sjma Apachee, and the decendent's sisters, Maxine Apachee, Harriet Apachee and Geneva Apachee.

Shortly after the commencement of this probate a dispute arose over who is entitled to $40,000.00 in insurance proceeds from the decendent's group life insurance policy. While the former Mrs. Apachee was the named beneficiary of the policy, this court ruled that she had lost all right, title and interest to the proceeds due to the divorce. The Court's opinion is reported at 3 Navajo Rep. 250. (D. Window Rock, 1982).

The administratrix of the estate, Judy Glanzer (the decedent's sister, has previously filed her final accounting and a proposed distribution. The assets of the estate are $45,045.40 in cash, a motorcycle, a stero, some miscellaneous books, pictures and some papers. Some property was buried with the decendent, and his clothing was burned. This is in accordance with Navajo traditional practices.

There is an objection to some of te expenditures of the administratrix, and a demand that she be required to bear the cost of them. The objected expenditures are attorney's fees to Lawrence Ruzow, Esq., filing fees for an adoption action brought by the administratrix affecting the decedent's son, private investigator fees and trips made to Window Rock insofar as there is not a more precise statement of the nature of the trips.

The proposed distribution is that "the assets be divided pursuant to Navajo custom to all heirs, meaning immediate family," and the "immediate family" listed includes the decedent's surviving child, the decedent's parents, five sisters and three brothers. The distribution plan does not indicate whether the property is to be divided equally, but assuming that is the prayer, there would be eleven heirs and the division of the gross cash estate would be $4,095.03 each. (Of course, estate debts would have to be deducted from the gross figure first).

At trial, the decent's mother, Faye Apachee, claimed that the Navajo customary law is that she is to receive all the property of the estate for the purpose of making a distribution to the brothers, sisters and the son. Lloyd Apachee's mother, claimed, on his behalf, that Lloyd is the only heir and entitled to all the estate. At the hearing she claimed $10% of the estate, but didn't know how much that would be. There is also a claim that she is entitled to accrued child support as a lien against the estate.

ISSUES TO BE DECIDED BY THE COURT:

1.    Is the accounting of the estate assets accurate?
2.    What expenses will be allowed or disallowed?
3.    What is the Navajo common law of intestate distribution of money and personal property where the decedent was divorced and living with his parents and the decendent's child was living with the former wife?
4.    Of what effect is the claim for child support?
5.    What should be the final distribution of the estate assets?

THE LAW TO BE APPLIED IN THIS CASE:

The Navajo Tribal Council has given the Court guidance on what laws are to apply in probate cases. 8 NTC Sec. 2 provides:

> "In the determination of heirs the court shall apply the custom of the Tribe as to inheritance if such custom is proved. Otherwise the court shall apply state law in deciding what relatives of the decedent are entitled to be his heirs."

In this case the court has heard testimonies of the parties regarding Navajo customary principles of inheritance, and in deciding the law from that testimony the court will weigh it as it weighs evidence of fact. Another method of proving custom in this case will the court taking judicial notice of matters of Navajo common law which are commonly known or easily found in acceptable works on Navajo common law. Yet another method of proof of custom is the prior decisions of the Navajo Courts.

The statute unfortunately would appear to require the court to make an immediate jump from Navajo custom to state law provisions which may not fit Navajo needs and expectations. However, this court will adopt the ancient precedent that the Navajo common law is as the English common law:

> "The lex non scripta, or unwritten law, includes not only general customs, or the common law properly so

called; but also the <u>particular customs</u> of certain parts of the kingdom; and likewise those <u>particular laws</u>, that are by custom observed only in certain courts and jurisdictions." Blackstone, I <u>commentaries on the Law of England</u> 62 (Emphasis in the original).

The Navajo common law is making a transition into a written form, but the recorded decisions of the Navajo judges are still common law.

"When I call these parts of our law <u>leges non Scriptae</u>, I would not be understood as if all those laws were at present merely <u>oral</u>, or communicated from the former ages to the present solely by word of mouth... But, with us at present, the monuments and evidences of our legal customs are contained in the records of the several courts of justice in books of reports and judicial decisions, and in the treaties of learned sages of the profession, preserved and handed down to us from the times of highest antiquity. However, I therefore style these parts of our law <u>leges non scriptae</u>, because their original institution and authority are not set down in writing, as acts of parliment are, but they receive their binding power, and the force of laws, by long and immemorial usage, and their universal reception throughout the kingdom." <u>Id</u>, 64-64 (Emphasis in the original).

This court takes judicial notice of the fact that state probate procedures and rules of inheritance are ultimately founded upon the customs of medieval England and the needs of its society. Navajo probate procedures and rules of inheritance should reflect the needs of the Navajo Society and the Navajo way of doing things. Therefore, this court announces as a rule of interpretation of 8 NTC Sec. 2, that the word "custom" for the purposes of the statute not only includes customs which may be testified to, judicially noticed, proved by expert testimony or otherwise shown by evidence, but it includes recorded opinions and decisions of the Navajo Courts (not dealing with statutory interpretation or the application of principles of state or general Anglo-European law), and <u>some</u> learned treatises on Navajo ways. The Navajo Tribal Council will be deemed to have intended this result because of the general principle that a legislature is presumed to have had the common law in mind when it enacts a statute. (Since the Navajo Tribal Council has generally enacted statutes which mirror Anglo-European law, it will be deemed to have had the basic definition of common law as custom law and (Sir William Blackstone's views in mind). Only some learned treatises on Navajo Ways will be deemed to reflect Navajo common law because this Court's experience with the works of anthropologists, ethnologists and other commentators on the Navajos is that often these works are incomplete, inaccurate or do not reflect the current state of the Navajo common law, which is a living spirit of the Navajo People. The court notes that the more reliable works for use in finding Navajo common law are those authored by wise and experienced Navajo authors. The <u>Dine</u>' are the most accurate commentators on themselves.

The court also pronounces its preference for the term "Navajo Common Law" rather than "custom" for the reason that it is not widely understood that the customs and traditions of the Navajo People <u>are</u> law, and the English term is used because it more accurately <u>reflects</u> our customs as law.

Therefore, the court will use these methods of finding the Navajo common law which is given preference in 8 NTC Sec. 2.

There is one final point to discuss in the question of what law applies. Rebecca Jim argues that there is no establishing Navajo custom regarding the distribution of money, and that because the Judges of the Navajo Nation have adopted rules of court for the distribution of estates, those rules should apply. As will be demonstrated, there are indeed Navajo common rules on the distribution of money after death, and even if the rules could be interpreted as indicated by Mrs. Jim, such an interpretation could not override the clear direction of the Navajo Tribal Council.

## IS THE ACCOUNTING OF THE ESTATE ASSETS ACCURATE?

The court finds that the accounting as to assets is accurate and acceptable, particularly since it was prepared by a trustworthy accountant. The property of the estate consists of $45,045.40 in cash, a motorcycle, a stero, some books, pictures and some papers.

## WHAT EXPENSES WILL BE ALLOWED OR DISALLOWED?

The courts finds that the hiring of a pivate investigator to "search" for Lloyd Apachee and prepare evidence for an adoption action, and the payment on filing fees in the Crownpoint District Court for that action are unrelated to any proper debt of the decedent or any relevant expense of the administratrix, but the court disallows the private investigator fees and the filing fees and allows the administratrix's expenses in the sum of $1,521.40.

## WHAT IS THE NAVAJO COMMON LAW OF INTESTATE DISTRIBUTION OF MONEY AND PERSONAL PROPERTY WHERE THE DECEDENT WAS DIVORCED AND LIVING WITH HIS PARENTS AND THE DECEDENT"S CHILD WAS LIVING WITH THE FORMER WIFE?

The court classifies property as follows: A man is standing in an imaginary circle, and he has all his possessions - everything he calls life. They are (1) his wife and children, (2) his religion (including its paraphenalia, mountain dust, bundles, etc.) (3) his land, (4) his livestock and (5) his jewelry, including money. This agrees in essence with the anthropological material cited in the <u>Estate of Peshlakai</u> which named (1) "Hard goods" <u>(nit-tlis)</u>, including coin, silver ornaments, white and yellow shell, coral and cannel coal, (2) "Soft and flexible goods" (yudi), including cloth, baskets, hides, skins and clothing, (3) "Ceremonial values" <u>(jish)</u>, including chants, herb medicines, good luck formulae, sacred names, medicine bags, paraphenalia, etc., (4) Agricultural or range land <u>(Kay-yah)</u>, and "Game goods" <u>(Dinneh-chil-ah-tas-aye)</u>, consisting of domesticated and wild animals. Opinion and Order, No. WR-CV-304-82 (December 30, 1982).

In this particular case we are dealing with "money". In order to understand the principles of the Navajo common law of probate there are some basic facts about the Navajo economy which must be understood. The Navajo economy has traditionally been based upon grazing sheep for food, clothing and marketing. This ties the Navajo to the land. It must also be understood that the Navajo clan system is very important, with a child being of the mother's clan and "born for" the father's clan. The clan is important, and the family as an economic unit is vital. The Navajo live together in family groups which can include parents, children, grandparents, brothers and sisters, and all the members of the family group have important duties to each other. These duties are based on the need to survive and upon very important religious values which command each to support each other and the group. Some call these family and clan members living together a "residence group," and some call them a "camp." Shepardson and Hammond, "Navajo Inheritance Patterns: Randon or Regular?," V. Ethnology 87, 90 (No. 1, Jan. 1966); Barsh, Navajo Property law and Probate, 1940-1972, p. 13. (Unpublished manuscript. This document was prepared as an experimental outline of Navajo probate law in cooperation with the Navajo court of appeals and former Chief Justice Virgil L. Kirk). The meaning of these terms is actually that groups of Navajo who are related by blood or clan will live together for mutual protection and the common good, and the important point is that there is a difference in the distribution of property, depending upon whether it is an essential piece of property for the maintenance of the camp.

There is a division of property into productive goods and nonproductive goods. Productive goods, such as sheep and land (including land permits), are held for the benefit of the individual and the camp, and upon death such property is held for the benefit of those living in the camp. Nonproductive goods (jewelry, tools and equipment, nonsubsistence livestock such as horses) belong to the individual. Cash can present a special problem because it can be treated either as productive property or nonproductive property. Treated as productive property, cash would be held in the camp for its economic security as a unit. Seen as nonproductive, cash would be distributed among family members.

Nonproductive goods are distributed by the camp where the decedent resided at the time of his death. A gathering is held, supervised by an agreed representative, and there is a discussion of how the property should be divided. This process may be assisted by a nataani or some other community leader. (The peacemaker of the Navajo Peacemaker Court could also be used). The property is then distributed with a preference to the immediate family members of the decedent, and the comparative need of claimants is also considered. The principle things considered in the distribution are residence in the camp and need, although other relatives not living in the camp may participate.

Under the old ways children did not necessarily have any preference in inheritance because of the fact they usually had a share in the family herd and because of the fact that Navajo children are always cared for by their family. The father's family would recognize that his children were "born for" their clan and would help if it was needed.

Therefore the court finds that the claim of Faye Apachee that the property should be given to her for distribution is essentially

correct. However, in order to be more correctly in accordance with the common law by granting preference to the immediate family and granting the prayer that the distribution be to the "heirs, meaning immediate family," that term requires discussion.

The Navajo Court of Appeals has struggled with the term "immediate family" in connection with who must be present for a valid oral will. Estate of Ray Lee, 1 Navajo Rep. 27 (1971) and Estate of Chisney Benally, 1 Navajo Rep. 219 (1978). In the Benally case the wife and children of the decedent's second marriage (who lived with him) were present, and the wife and children of the first marriage (who did not live with the decedent) were not. It was held that the first wife and children were not members of the decedent's "immediate family."

From the previous discussion we can see that the object of Navajo common law probate is to benefit the camp or residence group as a unit in the case of productive property and to benefit those living together and those in need in the case of nonproductive property. Since the court has received no evidence or claim that the cash should go to the residential family unit of the decedent, the money will be treated as "nonproductive" property.

The logic of finding a definition of "immediate family" in this case is simple. The decendent lived with his mother, his father and his sisters, Maxine, Harriet and Geneva. They would logically belong to the "immediate family" because of the close ties of blood, but more importantly, because of the mutual assistance and support they gave to each other. Lloyd Apache is also a logical member of the "immediate family" because he was "born for" his father's clan and is in need of assistance.

This means that there are six heirs to the property, and the court must now dispose of the net estate among them. The alternatives are to either make an equal distribution or to grant Faye Apachee's request that the property be given to her for distribution or to make distribution based on preference to the immediate family members of the decedent considering comparative needs of the claimant.

Having identified the immediate family and the common law method of distribution, the Court finds that the proper means of dealing with this situation would be to make distribution based on needs. The court does not have evidence of "need," as used in the Navajo common law, and another hearing involving the "immediate family" as discussed in this opinion would be proper disposition.

In passing the court will note that the burning of the decedent's clothing and placing some property with him at the time of burial are in accord with the Navajo common law. Some things are always left with the deceased because "the things were his or hers. More was added out of love for (the) dead one." Barsh, supra, p. 13.

OF WHAT EFFECT IS THE CLAIM FOR CHILD SUPPORT?

First of all, the claim will be denied because a proper written claim was not submitted. The court does not acknowledge the state law offered to support a claim that child support is a lien on the estate and a continuing obligaton because there was no "right" of a child to inherit under Navajo common law due to the family structure and the care for children.

The court does recognize that times are changing and that the Navajo Courts have consistently given children preference in probate proceedings. See Barsh, supra, at pp. 34, 35, 38, 41 and 54. However, it has been the children who have resided with the decedent who have been given preference.

The court will not rule upon the question of the effect of a child support order on an estate in this case, particularly since the court does not have a formal claim before it. The child will be provided for here and have an opportunity to present his need. However, in situations where the court finds children not provided for in accordance with common law practices, it will reserve the right as the legal protector of children to make special provisions for them.

## WHAT SHOULD BE THE FINAL DISTRIBUTION OF THE ESTATE ASSETS?

The net estate shall be distributed to the heirs.

## ORDER

1. The heirs of this estate are determined to be Lloyd Apachee, Faye Apachee, Sjma Apachee, Harriet Apachee, Geneva Apachee, and Maxine Apachee.

2. The net estate will be distributed to the heirs by the Court on the basis of need.

3. The court will hear evidence on needs of each heir on the 15th day of December, 1983, at 8:30 o'clock a.m. All members of the immediate family of the decedent shall be present. The administratrix shall also be present for this hearing;

4. The accounting of; the administratrix shall be approved with the exception of fees for a private investigator and court filing fees, which shall be borne by the administratrix;

5. Upon completion of the hearing of "needs" of the heirs, the court will enter an order releasing the estate assets to those to whom they were distributed;

6. Those assets distributed to Lloyd Apachee shall be managed by Rebecca Jim as the guardian of the property of her child, invested in an interest-bearing account or security, and no money shall be withdrawn and spent by her without the prior leave of the court, which may be granted informally.

SO ORDERED